# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

JOHN IIAMS,
                    *Plaintiff,*


     vs.                                             Case No. 6:13-CV-1227-EFM


CAROLYN W. COLVIN,
Commissioner of Social Security
                    *Defendant.*

## MEMORANDUM AND ORDER

Plaintiff John Iiams ("Plaintiff") seeks review of a final decision by Defendant, the Commissioner of Social Security ("Commissioner"), denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, respectively, and attorney's fees. In his pleadings, Plaintiff alleges three assignments of error concerning the assessment of his residual functional capacity: (1) a failure to properly weigh the opinions of the state examiners, (2) a failure to properly weigh the opinion of Plaintiff's treating source, and (3) credibility issues. Upon review, the Court finds that the Commissioner's decision was supported by substantial evidence contained in the record. As such, the decision of the Commissioner is affirmed.

## I.      Factual and Procedural Background

Plaintiff's relevant medical issues date back to July 11, 2008, when Plaintiff saw his family physician complaining that his right arm had not been working for the past week. An

examination found that Plaintiff could not raise his right arm at all, nor could he move it forward or backward. He also held his right arm down to his side with his palm facing outward. However, Plaintiff's doctor noted that "when [Plaintiff was] not aware of it, he use[d] the arm without any difficulty."[1] An x-ray showed no acute bony fracture, dislocation, or bony destruction. In October 2008, Plaintiff underwent an x-ray of his cervical spine. The scan showed a straightening of the spine with narrowing of the disc spaces at the C4-C7 vertebrae and anterior hyperostotic changes at the C3-T1 vertebrae.

The balance of Plaintiff's medical record consists of his numerous visits to chiropractor Gerald Kauffman, DC ("Kauffman"), who Plaintiff saw approximately twice per week from April 2009 through late 2011. Kauffman diagnosed Plaintiff with a frozen shoulder. From July 2010 through March 2011, when asked to rate his pain on a scale of one to nine, Plaintiff indicated that his neck pain was a two, and his mid and lower back pain was a one. Kauffman noted that Plaintiff had some swelling of the tissues, muscle spasms, taut and tender fibers, pain upon palpation, hypomobility of the vertebra, and a decrease in the normal range of motion. In mid-March 2011, and without explanation, Plaintiff's pain ratings changed as follows: neck pain at a six, neck pain radiating into right arm at a seven, mid back pain at a four, low back pain at a seven, and low back pain radiating into the right leg at an eight. Kauffman's narrative commentary did not reflect any reason for these changes, nor did it describe any additional symptoms. In May 2011, Plaintiff's mid back pain decreased to a four, where it remained through at least August 2011.[2]

---

[1] Doc. 6, at 283.

[2] Plaintiff's medical records also contain information from Plaintiff's cardiologist, Dr. Lambert A. Wu, MD ("Dr. Wu"). Dr. Wu noted that Plaintiff had an acute inferior wall myocardial infarction on May 30, 2005, which was treated with a left and right coronary arteriography and Cypher drug-eluting stent. Plaintiff returned to Dr. Wu

Plaintiff filed for both DIB and SSI on June 10, 2010, alleging disability beginning May 2, 2010.[3] His claims were denied initially on September 14, 2010, and upon reconsideration on October 7, 2010. Plaintiff timely filed a request for an administrative hearing, which took place on September 27, 2011, before Administrative Law Judge Michael Shilling ("ALJ Shilling"). Plaintiff, represented by counsel, appeared and testified.

At the time of the hearing, Plaintiff was sixty years old and lived alone. Plaintiff testified that he graduated high school and took a course when he began employment with a hospital. When asked what prevented him from returning to work, Plaintiff cited the pain in his shoulder as well as leg and foot numbness. Plaintiff indicated that he injured his right shoulder while moving a cement birdbath and this injury resulted in adhesive capsulitis, or frozen shoulder. He sought treatment with his chiropractor, Kauffman, and testified that no one had ever discussed with him additional treatment options. Plaintiff testified that he did not take any type of pain medication, including over-the-counter remedies, but did use BioFreeze on his leg and ice to relieve the pain in his right shoulder. He noted that his chiropractic sessions provided temporary relief. Plaintiff testified that Kauffman discussed surgery but allegedly told Plaintiff that the surgery was "experimental" and "very expensive" and would involve breaking Plaintiff's collarbone.[4]

---

once per year. His most recent appointment in August 2011 showed no concerns for his heart. Plaintiff does not allege disability based on his cardiac issues.

[3] The Court notes that Plaintiff initially filed for DIB and SSI on August 19, 2008. These claims were denied on February 19, 2009. Following a March 2010 administrative hearing, Plaintiff's applications were again denied on April 30, 2010, just weeks before Plaintiff's current applications were filed. The Appeals Council denied review of these claims on November 24, 2010.

[4] Doc. 6, at 43.

With regard to activities of daily living, Plaintiff testified that he could cook, do yard work, and drive, although not on the highway. He indicated that his adult daughter took care of most of his household chores, including laundry. Plaintiff also noted that he had difficulty getting dressed and undressed and limited himself to one shower per week due to his shoulder pain. He testified that he could lift ten to fifteen pounds with his left arm, sit for an hour at a time, and stand for thirty to forty minutes at a time. Plaintiff indicated that he did not use a sling to help stabilize his shoulder but used a cane for walking longer distances.

In addition to Plaintiff's testimony, ALJ Shilling also sought the testimony of Vocational Expert Alissa Smith ("VE Smith") to determine how, if at all, Plaintiff's impairments and limitations affected his ability to return to the workforce. VE Smith described Plaintiff's past work as a psychiatric aide as semi-skilled and typically performed at a medium level, although she noted that Plaintiff performed this job more at a heavy level of exertion. The VE described Plaintiff's past work as a security guard as semi-skilled and light, and his past work as a hotel housekeeper as unskilled and light. Based on this testimony, and upon his review of Plaintiff's entire record, ALJ Shilling asked the VE a series of hypothetical questions that included varying degrees of limitation on actions such as lifting, walking, standing, sitting, climbing, pushing/pulling, balancing, and reaching. Plaintiff's counsel did not pose any hypothetical questions.

On November 1, 2011, ALJ Shilling issued his decision, finding that Plaintiff suffered from a variety of severe impairments, including right shoulder pain, coronary artery disease, and obesity. Despite these findings, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. ALJ Shilling concluded that Plaintiff retained the

residual functional capacity to perform medium work, as that term is defined under Social Security Regulations, with the following limitations and/or exceptions: (1) only occasionally lift and/or carry fifty pounds and frequently lift and or carry twenty-five pounds; (2) stand and walk for six hours out of an eight-hour workday; (3) sit for six hours out of an eight-hour workday; (4) frequently balance, stoop, crouch, crawl, and climb stairs; (4) occasionally climb ropes, scaffolds, or ladders; and (5) frequently engage in overhead reaching and handling. The ALJ therefore concluded that Plaintiff had not been under a disability since May 1, 2010, the alleged onset date, through the date of his decision.

Given this unfavorable result, Plaintiff sought reconsideration of ALJ Shilling's decision from the Appeals Council. The Council denied review on April 12, 2013. As such, the ALJ's November 2011 decision became the final decision of the Commissioner.

On June 10, 2013, Plaintiff filed a Complaint in the United States District Court, District of Kansas seeking reversal and the immediate award of benefits or, in the alternative, a remand to the Commissioner for further consideration. Plaintiff also seeks attorney's fees. Given Plaintiff's exhaustion of all administrative remedies, his claim is now ripe for review before this Court.

## II.    Legal Standard

Judicial review of the Commissioner's decision is guided by the Social Security Act (the "Act") which provides, in part, that the "findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive."[5] The court must therefore determine whether the factual findings of the Commissioner are supported by substantial evidence in the

---

[5] 42 U.S.C. § 405(g).

record and whether the ALJ applied the correct legal standard.[6]  "Substantial evidence is more than a scintilla, but less than a preponderance; in short, it is such evidence as a reasonable mind might accept to support the conclusion."[7]  The court may "neither reweigh the evidence nor substitute [its] judgment for that of the [Commissioner]."[8]

An individual is under a disability only if he can "establish that [he] has a physical or mental impairment which prevents [him] from engaging in substantial gainful activity and is expected to result in death or to last for a continuous period of at least twelve months."[9]  This impairment "must be severe enough that [he] is unable to perform [his] past relevant work, and further cannot engage in other substantial gainful work existing in the national economy, considering [his] age, education, and work experience."[10]

Pursuant to the Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled.[11]  The steps are designed to be followed in order.  If it is determined, at any step of the evaluation process, that the claimant is or is not disabled, further evaluation under a subsequent step is unnecessary.[12]

The first three steps of the sequential evaluation require the Commissioner to assess: (1) whether the claimant has engaged in substantial gainful activity since the onset of the alleged

---

[6] *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).

[7] *Barkley v. Astrue*, 2010 U.S. Dist. LEXIS 76220, at *3 (D. Kan. July 28, 2010) (citing *Castellano v. Sec'y of Health & Human Servs.*, 26 F.3d 1027, 1028 (10th Cir. 1994)).

[8] *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (quoting *Casias v. Sec'y of Health & Human Servs.*, 933 F.3d 799, 800 (10th Cir. 1991)).

[9] *Brennan v. Astrue*, 501 F. Supp. 2d 1303, 1306-07 (D. Kan. 2007) (citing 42 U.S.C. § 423(d)).

[10] *Barkley*, 2010 U.S. Dist. LEXIS 76220, at *3 (citing *Barnhart v. Walton*, 535 U.S. 212, 217-22 (2002)).

[11] *Wilson v. Astrue*, 602 F.3d 1136, 1139 (10th Cir. 2010); *see also* 20 C.F.R. § 404.1520(a).

[12] *Barkley*, 2010 U.S. Dist. LEXIS 76220, at *4.

disability; (2) whether the claimant has a severe, or combination of severe, impairments; and (3) whether the severity of those severe impairments meets or equals a designated list of impairments.[13]  If the impairment does not meet or equal one of these designated impairments, the ALJ must then determine the claimant's residual functional capacity, which is the claimant's ability "to do physical and mental work activities on a sustained basis despite limitations from [his] impairments."[14]

Upon assessing the claimant's residual functional capacity, the Commissioner moves on to steps four and five, which require the Commissioner to determine whether the claimant can either perform his past relevant work or whether he can generally perform other work that exists in the national economy, respectively.[15]  The claimant bears the burden in steps one through four to prove a disability that prevents performance of his past relevant work.[16]  The burden then shifts to the Commissioner at step five to show that, despite his alleged impairments, the claimant can perform other work in the national economy.[17]

### III.    Analysis

Plaintiff's three assignments of error, namely the ALJ's failure to properly weigh the opinions of the state examiners and Plaintiff's treating source as well as Plaintiff's credibility, all stem from the ALJ's assessment of Plaintiff's residual functional capacity.  Specifically, Plaintiff alleges that the ALJ's failure to properly evaluate these three components resulted in an improper

---

[13] *Lax*, 489 F.3d at 1084; *see also Barkley*, 2010 U.S. Dist. LEXIS 76220, at *4-5 (citing *Williams v. Bowen*, 844 F.2d 748, 751 (10th Cir. 1988)).

[14] *Barkley*, 2010 U.S. Dist. LEXIS 76220, at *5; *see also* 20 C.F.R. §§ 404.1520(e), 404.1545.

[15] *Barkley*, 2010 U.S. Dist. LEXIS 76220, at *5 (citing *Williams*, 844 F.2d at 751).

[16] *Lax*, 489 F.3d at 1084.

[17] *Id.*

assessment of Plaintiff's residual functional capacity, one that was not based on substantial evidence. The Court finds Plaintiff's arguments to be without merit. As a preliminary matter, some general information regarding residual functional capacity is helpful.

## A. Residual Functional Capacity

"[R]esidual functional capacity consists of those activities that a claimant can still perform on a regular and continuing basis despite his or her physical limitations."[18] A residual functional capacity assessment "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence."[19] The ALJ also must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a "regular and continuing basis" and describe the maximum amount of work-related activity the individual can perform based on evidence contained in the case record.[20] The ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved."[21] However, there is "no requirement in the regulations for a direct correspondence between an RFC finding and a specific medical opinion on the functional capacity in question."[22]

### 1. Weight Assigned to Treating Sources and State Examiners

As a general rule, "[t]he opinions of physicians, psychologists, or psychiatrists who have seen a claimant over a period of time for purposes of treatment are given more weight than the

---

[18] *White v. Barnhart*, 287 F.3d 903, 906 n.2 (10th Cir. 2001).

[19] SSR 96-8p, 1996 SSR LEXIS 5, at *19 (July 2, 1996).

[20] *Id.*

[21] *Id.*

[22] *Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012).

views of consulting physicians or those who only review the medical records and never examine the claimant."[23]  "The opinion of an examining physician is generally entitled to less weight than that of a treating physician, and the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all."[24]  "If an ALJ intends to rely on a nontreating physician or examiner's opinion, he must explain the weight he is giving to it."[25]

### a. Weight Assigned to the Opinions of State Examiners

Plaintiff first alleges that ALJ Shilling failed to properly consider and weigh the opinions of state examiners Dr. Jay T. Hughey, DO ("Dr. Hughey") and Dr. C.A. Parsons, MD ("Dr. Parsons").  Specifically, Plaintiff claims that the ALJ inappropriately gave more weight to the opinion of state examiner Dr. Divina San Diego ("Dr. San Diego"), even though Dr. San Diego's opinion was less detailed and outdated.  This Court disagrees.

Plaintiff underwent two consultative evaluations in connection with his claims for DIB and SSI, one on August 25, 2010, with Dr. San Diego, and one on January 8, 2011, with Dr. Hughey.  On January 27, 2011, Dr. Parsons submitted a "check the box" assessment of Plaintiff's physical residual functional capacity based on his review of Plaintiff's medical records.  In her August 2010 evaluation, Dr. San Diego concluded that, although Plaintiff rated his right shoulder pain as an eight out of a possible ten, examination revealed no gross swelling, ecchymosis, erythema, or deformity.  Plaintiff resisted passive range of motion but was able to abduct his right shoulder up to twenty degrees when asked to put on his shirt.  Dr. San Diego

---

[23] *Romero v. Colvin*, 2014 U.S. Dist. LEXIS 39984, *7 (D. Kan. Mar. 26, 2014) (citing *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004)).

[24] *Id.*

[25] *Romero*, 2014 U.S. Dist. LEXIS 39984, at *7-8 (citing *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004)).

also found that Plaintiff had upper right extremity strength of three to four out of a possible five and noted that Plaintiff was "not exerting good efforts during the examinations."[26] ALJ Shilling assigned Dr. San Diego's opinion significant weight, as it was rendered after an examination of Plaintiff and was supported by the general lack of evidence in the record.

During the January 2011 evaluation with Dr. Hughey, Plaintiff was found to have a significant reduction in the range of motion of his right shoulder. However, Dr. Hughey concluded that Plaintiff's grip strength and dexterity were preserved.[27] Plaintiff alleges that this opinion was entitled to more weight than that of Dr. San Diego because: (1) Dr. Hughey performed a thorough examination, (2) there was no question about the level of effort exerted by Plaintiff during the examination, (3) there was objective testing, and (4) it was more recent. This Court fails to see how any of these elements make a difference. As a whole, Dr. San Diego's and Dr. Hughey's evaluations seem similar: both doctors actually examined Plaintiff, both found Plaintiff to have shoulder pain, and both found Plaintiff to retain fairly good strength. The main difference between the opinions appears to be Plaintiff's range of motion. While Dr. San Diego found that Plaintiff had good range of motion in his right shoulder both passively and actively, despite Plaintiff's desire to keep his right arm at his side, Dr. Hughey concluded that Plaintiff had a significant reduction in his range of motion. As the ALJ noted, this finding does not comport with the balance of the medical evidence, namely Plaintiff's lack of medical treatment and overall activities of daily living.

---

[26] Doc. 6, at 293.

[27] Both Plaintiff and Commissioner claim that the ALJ assigned little weight to the opinion of Dr. Hughey. Upon review, this Court was unable to locate that precise language in the ALJ's decision, although it is clear from his discussion of Dr. Hughey that ALJ Shilling gives little credence to Dr. Hughey's opinion. Since both Plaintiff and Commissioner agree that the ALJ assigned Dr. Hughey's opinion little weight, the Court will adopt this conceded issue.

Plaintiff also alleges that Dr. San Diego's opinion was not entitled to significant weight since it "was performed in August 2010 when there was very little medical evidence to review and his examination was limited as well to just an examination."[28] However, at the time of Dr. San Diego's examination, Plaintiff had already had x-rays of his right shoulder and cervical spine, both of which were rather benign, and had begun seeing Kauffman twice per week. The day before his examination with Dr. San Diego, Plaintiff visited Kauffman and rated his neck pain as a two out of a possible nine and his mid and lower back pain as a one out of a possible nine. Plaintiff's pain ratings and examination findings with Kauffman remained consistent through January 6, 2011, just two days before Plaintiff was evaluated by Dr. Hughey. The date of Dr. San Diego's examination therefore seems irrelevant, as Dr. Hughey's examination was based on virtually identical evidence.

It is equally as confusing to this Court, given these findings, as to why Dr. Parsons, having only reviewed Plaintiff's medical record, including the findings of Drs. San Diego and Hughey, drastically limited Plaintiff's residual functional capacity. Dr. Parsons opined that Plaintiff could: (1) occasionally lift and/or carry twenty pounds; (2) frequently lift and/or carry ten pounds; (3) stand and/or walk for a total of six hours during an eight-hour workday; (4) sit for a total of six hours during an eight-hour workday; and (5) engage in limited pushing and pulling with his upper extremities. Dr. Parsons also concluded that Plaintiff could never climb ladders, ropes, or scaffolds, or crawl, and was limited in his ability to reach and engage in both gross and fine manipulation. The ALJ assigned this opinion little weight, noting that Dr. Parsons' findings were not based on the objective evidence of record, given Plaintiff's lack of

---

[28] Doc. 7, at 11.

medical treatment, radiological results, the findings of Dr. San Diego, and the rather limited findings of Kauffman.

Finally, Plaintiff alleges that ALJ Shilling failed to address all aspects of Drs. San Diego's and Hughey's findings, specifically leaving out Dr. San Diego's examination of Plaintiff's left hand and right leg and the results of a lumbar x-ray, ordered by Dr. Hughey in January 2011. While ALJ Shilling may not have discussed these alleged impairments specifically with regard to the weight given to the consultative examiner's opinions, he *did*, in fact, discuss them, noting that

> a review of the medical record reflects the impairments of left hand/right leg paresthesias, dyslipidemia and hypertension. However, regarding the claimant's left finger numbness and stinging, he testified that they do not prevent its use. Regarding his right leg numbness, the claimant reported to [Dr. Hughey] in January 2011 that he could 'walk for 20 minutes before being limited by discomfort' and his hypertension was found to have 'no associated signs or symptoms.'[29]

Furthermore, in his discussion of Dr. San Diego's findings, ALJ Shilling noted that Dr. San Diego reported that Plaintiff "had no atrophy or fasciculations of his left hand."[30] ALJ Shilling ultimately concluded, given their minimal influence on Plaintiff's ability to perform basic work activity, that these impairments were non-severe. Ultimately, even if this Court found the findings concerning Plaintiff's left hand, right leg, and lumbar x-ray to be relevant, which it does not, it cannot "reweigh the evidence nor substitute [its] judgment for that of the agency"[31] when it finds the ALJ's opinion to be based on substantial evidence.

---

[29] Doc. 6, at 17-18.

[30] Doc. 6, at 20.

[31] *White*, 287 F.3d at 905.

The Court also notes the apparent contradiction in Plaintiff's argument: while he does not think Dr. San Diego's opinion is entitled to significant weight given Dr. San Diego's minimal and rather benign findings, Plaintiff *does* want to rely on Dr. San Diego's findings to note further limitations. Plaintiff cannot simply pick and choose from and within medical records and use only the facts that support his case.

Based on a review of Plaintiff's entire record, including his chiropractic treatment and administrative hearing testimony, this Court finds that the ALJ's decision concerning the opinions of Plaintiff's consultative examiners was indeed based on substantial evidence. As such, Plaintiff's first assignment of error is without merit and is therefore dismissed.

### b. Weight Assigned to Plaintiff's Chiropractor

Plaintiff next argues that the ALJ failed to properly weigh the opinion of his treating chiropractor, Kauffman. In his decision, the ALJ noted that as a chiropractor, Kauffman was not considered an acceptable medical source under Social Security Regulations. He assigned the opinion "little weight," as he found Kauffman's opinion not supported by either the objective medical evidence of record or Plaintiff's own testimony.

As a general rule, "the Commissioner may use evidence from 'other medical sources' such as nurse-practitioners, physician's assistants, naturopaths, *chiropractors*, audiologists, and therapists, none of which are on the list of 'acceptable medical sources,' to show the severity of [a] plaintiff's impairments and how they affect his ability to work."[32] Recognizing that an increasing number of claimants receive their medical care by these types of health care

---

[32] *Dixon v. Astrue*, 2011 U.S. Dist. LEXIS 37518, at *10 (D. Kan. Apr. 6, 2011) (citing 20 C.F.R. §§ 404.1513(d), 416.913(d)) (emphasis added).

providers, the Commissioner promulgated Social Security Ruling 06-03p which states, in relevant part:

> [w]ith the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not 'acceptable medical sources,' such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed 'acceptable medical sources' under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with other relevant evidence in the file.[33]

The Ruling further explains that a disability "adjudicator generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence . . . allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case."[34] The ruling also provides a list of factors that an ALJ should consider in his analysis of these "other sources," including: (1) how long the source has known and how frequently the source has seen the individual, (2) how consistent the opinion is with other evidence, (3) the degree to which the source presents relevant evidence to support an opinion, (4) how well the source explains the opinion, (5) whether the source has a specialty or area of expertise related to the individual's impairment(s), and (6) any other factors that tend to support or refute the opinion.[35] Importantly, the Ruling also provides that "[n]ot every factor for weighing opinion evidence will apply in every case. The

---

[33] SSR 06-03p, 2006 SSR LEXIS 5, at *8 (2006).

[34] SSR 06-03p, at *6; *see also Bowman*, 511 F.3d at 1274 (noting that SSR 06-03p requires an ALJ to evaluate medical opinions from providers who are not deemed "acceptable medical sources" and explain the weight given to them).

[35] SSR 06-03p, at *11.

evaluation of an opinion from a medical source who is not an 'acceptable medical source' depends on the particular facts in each case."[36]

Here, Plaintiff alleges that, giving his lengthy treatment relationship with Kauffman and his consistent examinations, Kauffman's opinion should have at least been accorded substantial weight. On July 22, 2011, Kauffman issued a "check the box" medical source statement that limited Plaintiff to: (1) frequently lifting and/or carrying five pounds; (2) occasionally lifting and/or carrying five pounds; (3) standing and/or walking for thirty minutes at a time; (4) standing and/or walking for a total of one hour during an eight-hour day; (5) sitting for one hour at a time; (6) sitting for a total of one hour during an eight-hour day; (7) limited pushing and pulling; (8) never climbing, balancing, or crawling; and (9) occasionally stooping, kneeling, crouching, reaching, and handling. Kauffman also advised that Plaintiff should avoid all exposure to heights and lie down for twenty to forty minutes every hour.

ALJ Shilling went into a detailed analysis of Kauffman's findings and, after comparing them to the balance of the medical record, concluded that Kauffman's opinion and diagnoses were entitled to

> little weight because his opinion [was] not consistent with the medical record, including the claimant's testimony that he could lift 10-15 pounds with his left arm as well as his statement to [Dr. Hughey] that he could sit for two hours 'before being limited by discomfort.' Further, Dr. Kauffman is not an acceptable medical source.[37]

As stated above, an ALJ should "generally" explain the weight given to opinions from other sources; however, the Ruling does not provide any set formula for what constitutes a

---

[36] *Id*. at *13.

[37] Doc. 6, at 20.

general explanation.[38]  Here, ALJ Shilling noted that Plaintiff consistently rated his neck pain as a two out of a possible nine and his mid and lower back pain as a one out of a possible nine from July 2010 through March 2011.  Suddenly, but without explanation, Plaintiff's pain increased to levels of six, seven, and eight out of nine in March 2011.  Kauffman's narrative record of Plaintiff's treatment sessions remained virtually unchanged, offering no explanation for Plaintiff's sudden increase in pain or alternative or updated treatment based on this change.  ALJ Shilling noted that Plaintiff could write with his right hand, did not engage in any physical therapy, MRI testing, epidural injections, or take any pain medication to manage his symptoms. The ALJ also referred to the fact that Plaintiff admitted that his chiropractic sessions provided relief and that Plaintiff never sought a second opinion from any other treatment provider.  This Court therefore finds the ALJ's explanation to be sufficient to meet the requirements of Ruling 06-03p.

The Court pauses here to discuss Plaintiff's citation of *Leggitt v. Sullivan*,[39] which Plaintiff erroneously attributes to the Tenth Circuit as standing for the idea that "a chiropractor's opinion as to diagnosis, nature, and degree of impairment arising from a condition within the chiropractor's field of expertise should generally be accorded 'substantial weight' under the treating physician rule."[40]  While this is indeed the holding of *Leggitt*, it is not a Tenth Circuit case and is therefore not binding on this Court.  Furthermore, *Leggitt* is a 1992 ruling, issued well before the Social Security Administration clarified, via SSR 06-03p in 1996, its policies concerning providers who are not medical sources.  Moreover, ALJ Shilling did not simply reject

---

[38] SSR 06-03p, at *15-16.

[39] 812 F. Supp. 1109 (D. Col. 1992).

[40] Doc. 7, at 15.

Kauffman's conclusions because he was a chiropractor. Rather, the ALJ rejected Kauffman's diagnosis and opinion because they did not comport with the balance of the objective medical evidence and Plaintiff's own testimony. As such, this Court finds Plaintiff's assignment of error with regard to Kauffman's opinion to be without merit. It is therefore dismissed.

### 2. Credibility

Finally, Plaintiff alleges that the ALJ erred by failing to conduct a proper credibility analysis as required by Social Security Ruling 96-7p[41] and *Luna v. Bowen*,[42] in that the ALJ improperly disregarded Plaintiff's statements regarding his limitations. Plaintiff's argument is without merit.

At the administrative hearing, Plaintiff testified that he had seen Kauffman consistently since 2008 but had not discussed any further treatment for his right shoulder outside of Kauffman's weekly adjustments. Plaintiff noted that he had some difficulty with housework, getting dressed and undressed, and showering, but could do yard work and did not require assistance with normal daily activities. Plaintiff also testified that he was not on any type of pain medication, including over-the-counter medication, for his shoulder, but did use BioFreeze on his leg.

Recognizing that "some claimants exaggerate symptoms for the purposes of obtaining government benefits,"[43] an ALJ's credibility determinations are generally treated as binding on

---

[41] 1996 SSR LEXIS 4 (July 2, 1996).

[42] 834 F.2d 161 (10th Cir. 1987).

[43] *Bolan v. Barnart*, 212 F. Supp. 2d 1248, 1260 (D. Kan. 2002) (citing *Frey v. Bowen*, 816 F.2d 508, 517 (10th Cir. 1987)).

review.[44]  "Credibility determinations are peculiarly the province of the finder of fact" and will not be overturned when supported by substantial evidence.[45]  The Court cannot displace the ALJ's choice between two fairly conflicting views even though the Court may have justifiably made a different choice.[46]  However, notwithstanding the deference generally given to an ALJ's credibility determination, "findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings."[47]

In evaluating a disability claim based on nonexertional symptoms, including pain, the ALJ must first determine whether the objective medical evidence demonstrates that a claimant suffers from an underlying medically determinable physical or mental impairment.[48]  If so, the ALJ must consider the relationship between the impairment and the alleged nonexertional limitation.[49]  If a loose nexus exists, the ALJ must then consider all the evidence, both objective and subjective, in determining whether a claimant's limitation is disabling.[50]  Factors that may be relevant in assessing the claimant's testimony include the levels of medication prescribed and their effectiveness, the extensiveness of the attempts (medical or non-medical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship

---

[44] *Talley v. Sullivan*, 908 F.2d 585, 587 (10th Cir. 1990); *Broadbent v. Harris*, 698 F.2d 407, 413 (10th Cir. 1983).

[45] *Wilson*, 602 F.3d at 1144; *Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005).

[46] *Oldham v. Astrue*, 509 F.3d 1254, 1257-58 (10th Cir. 2007).

[47] *Wilson*, 602 F.3d at 1144 (quoting *Huston v. Bowen*, 838 F.2d 1125, 1133 (10th Cir. 1998)).

[48] *Luna*, 834 F.2d at 163; *Williams*, 844 F.2d at 753.

[49] *Luna*, 834 F.2d at 164.

[50] *Id.*

between the claimant and other witnesses, and the consistency or compatibility of non-medical

testimony with objective medical evidence.[51]

> With regards to Plaintiff's credibility, ALJ Shilling concluded

> [a]fter considering the evidence of record . . . the claimant's medically
> determinable impairments could reasonably be expected to produce the alleged
> symptoms, but . . . the claimant's statements concerning the intensity, persistence
> and limiting effects of these symptoms are generally not fully credible.  As stated
> above, the claimant alleges he is unable to work.  However, the record establishes
> that the claimant is capable of working.  The claimant stated that he quit working
> in May 2007 because of a 'disagreement with [his] employer,' not due to any
> asserted medical condition.  Further, the claimant is able to engage in a wide
> range of activities of daily living that could translate into performing a job
> including driving, housecleaning, vacuuming, and cleaning dishes.  Therefore, he
> is capable of performing basic work activities consistent with the residual
> functional capacity stated above.[52]

ALJ Shilling further noted that Plaintiff testified that he was still able to write with his right hand

and that his treatment with Kauffman helped.  The ALJ also recognized that Plaintiff did not

receive any consistent treatment from a medical doctor and noted Dr. Hughey's January 2011

report that found that Plaintiff did not have a history of physical therapy, MRI testing, epidural

injection, or use of a transcutaneous electrical nerve stimulation unit.  Plaintiff also testified that

he did not take any pain medication, prescription or over-the-counter, to manage his right

shoulder symptoms.  While "[m]inimal or conservative medical treatment may evince a pain that

is not disabling,"[53] the ALJ "must not draw any inferences about an individual's symptoms and

their functional effects from a failure to seek or pursue regular medical treatment without first

---

[51] *Thompson v. Sullivan*, 987 F.2d 1482, 1489 (10th Cir. 1993).

[52] Doc. 6, at 21.

[53] *Dellinger v. Barnhart*, 298 F. Supp. 2d 1130, 1136 (D. Kan. 2003) (citing *Wiley v. Chater*, 967 F. Supp. 446, 451 (D. Kan. 1997)).

considering any explanations that the individual may provide."[54]  The ALJ noted that Plaintiff stated that he has not received medical treatment because he is unable to afford it.  During the administrative hearing, ALJ Shilling asked Plaintiff if any medical professional had recommended surgery for Plaintiff's shoulder, to which Plaintiff replied "[n]o, my chiropractor said there is one type of surgery that's kind of experimental, very expensive.  They basically break your collarbone."[55]  ALJ Shilling dismissed this justification, stating that "the evidence does not document that the claimant was ever refused treatment or medication for any reason, including insufficient funds."[56]  This Court tends to agree.  While the Tenth Circuit has repeatedly held that "the inability to pay *may* justify a claimant's failure to pursue or seek treatment,"[57]  Plaintiff makes no mention of seeking lower-cost or free healthcare.  There is also no indication that Plaintiff ever sought relief from an emergency room.

Based on a review of the record, this Court determines that the ALJ articulated specific reasons for finding Plaintiff not credible, and these reasons are affirmatively linked to evidence in the record.  As stated above, the Court will not reweigh the evidence or substitute its own judgment for that of the ALJ.[58]  As such, Plaintiff's assignment of error with regard to credibility is without merit and is therefore dismissed.

---

[54] SSR 96-7p, 1996 SSR LEXIS 4, at *22 (July 2, 1996).

[55] Doc. 6, at 43.

[56] Doc. 6, at 22.

[57] *Williams v. Astrue*, 2011 U.S. Dist. LEXIS 53027, at *17 (D. Kan. May 17, 2011) (emphasis added); *see also Thompson*, 987 F.2d at 1489-90; *Threet v. Barnhart*, 353 F.3d 1185, 1190 n.7 (10th Cir. 2003); SSR 96-7p, at *23 (the fact that "[t]he individual may be unable to afford treatment and may not have access to free or low-cost medical services" is a legitimate excuse).

[58] *Hackett*, 395 F.3d at 1173.

**B. Attorney's Fees**

Plaintiff requests that this Court award him attorney's fees, although Plaintiff fails to provide any basis for or documentation of the amount he is requesting. Section 206(b) of the Act provides that "[w]henever a court renders a judgment favorable to a claimant . . . the court may determine and allow as part of its judgment a reasonable [attorney] fee . . . not in excess of 25 percent of the past due benefits." This provision allows a court to award attorney fees in conjunction with a remand for further proceedings where a claimant ultimately recovers past due benefits.[59] As stated above, this Court denies Plaintiff's request to remand his request for benefits to the Commissioner. Without this remand, Plaintiff is not eligible for payment of attorney's fees. As such, Plaintiff's request for attorney's fees is denied.

**IT IS THEREFORE ORDERED** that the decision of the Commissioner is AFFIRMED.

**IT IS SO ORDERED**.

Dated this 22nd day of April, 2014.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE

---

[59] *See Wrenn ex rel. Wrenn v. Astrue*, 525 F.3d 931, 933 (10th Cir. 2008).